**JEWELPAK CORP., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 01–1300.

United States Court of Appeals, Federal Circuit.

DECIDED: July 16, 2002.

§ 12a, of the CEA, as well. This argument was raised for the first time on appeal, and therefore, we will not consider it.

Peter J. Fitch, Fitch, King and Caffentzis, of New York, NY, argued for plaintiff-appellant. With him on the brief was James Caffentzis.

Barbara S. Williams, Attorney, International Trade Field Office, Department of Justice, of New York, NY, argued for defendant-appellee. With her on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, Civil Division, Commercial Litigation Branch, Department of Justice, of Washington, DC.

Before MICHEL, GAJARSA, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge MICHEL. Dissenting opinion filed by Circuit Judge GAJARSA.

MICHEL, Circuit Judge.

This appeal involves a decision by the United States Customs Service ("Customs") to reclassify appellant Jewelpak Corporation's ("Jewelpak") so-called "presentation boxes" as "jewelry boxes" under subheading 4202.92.90 of the Harmonized Tariff Schedule of the United States ("HTSUS"). Following a two-day bench trial, the United States Court of International Trade entered judgment for the United States, affirming Customs' classification. *Jewelpak Corp. v. United States*, 131 F.Supp.2d 100 (Ct. Int'l Trade 2001) ("*Jewelpak III*"). For reasons explained further below, we affirm.

## I

Jewelpak is an importer of various types of "presentation boxes," plastic or metal boxes covered with either textile materials or plastic sheeting that are used to ship, store, and display items of jewelry. Under the Tariff Schedule of the United States ("TSUS"), Jewelpak's boxes were classified as "packaging" according to their component of chief value. During the late 1980s, however, the Harmonized System Committee ("HSC") had begun to consider amending the Explanatory Note of the Harmonized Tariff Schedule ("Notes") to modify the definition of "jewelry boxes" under Heading 4202.[1] When the HTSUS supplanted the TSUS on January 1, 1989, no amendment had been made; accordingly, the boxes at issue and those of similar ilk continued to be classified by Customs as "packaging," according to the material that provided their essential character, for at least a year.[2] The HSC eventually hammered out an amendment to the Note, redefining "jewelry boxes" as follows:

---

1. Heading 4202 includes: "Trunks suitcases, vanity cases, attaché cases, briefcases, school satchels, spectacle cases, binocular cases, camera cases, musical instrument cases, gun cases, holsters and similar containers; traveling bags, toiletry bags, knapsacks and backpacks, handbags, shopping bags, wallets, purses, map cases, cigarette cases, tobacco pouches, tool bags, sports bags, bottle cases, *jewelry boxes*, powder cases, cutlery cases and similar containers, of leather or of composi-

tion leather, of sheeting of plastics, of textile materials, of vulcanized fiber or of paperboard, or wholly made with paper: Other ... *with outer surface of sheeting of plastic or of textile materials ....*" (emphases added).

2. Jewelpak argues that the classification continued until at least May 1991; we need not decide this question, as it does not affect our analysis.

The term 'jewellery [sic throughout] boxes' covers not only boxes specially designed for keeping jewellery, but also similar lidded containers of various dimensions (with or without hinges or fasteners) specially shaped or fitted to contain one or more pieces of jewellery and normally lined with textile material, of the type in which articles of jewellery are presented and sold and which are suitable for long-term use.

Amended Explanatory Note to Heading 4202 (emphasis added).

This amendment became effective on January 1, 1990, exactly one year after the effective date of the HTSUS. According to the government, from 1990 through 1993, Customs "classified most containers similar to those at issue here as 'jewelry boxes' under heading 4202, with only a few exceptions." · Not surprisingly, two of those exceptions were rulings issued to Jewelpak by Customs Headquarters—on January 2, 1990, and July 26, 1991, respectively.

The first, Ruling HQ 086186, was a response to an inquiry from Jewelpak regarding the proper classification of the "presentation boxes" in light of the newly amended Note. Customs concluded that the boxes at issue were not "jewelry boxes" within the nomenclature of the HTSUS because they did not appear to be designed or specially fitted for holding and storing jewelry, and because they did not appear to be suitable for repeated, long-term use. Notably, Customs expressly declined Jewelpak's invitation to issue a binding ruling on the matter: "Twelve samples were included in your inquiry. A precise description of the materials used in each item was not provided in your letter .... Without information as to the component materials of the containers in this case, we are unable to provide a binding ruling as to the classification."

The second, Ruling HQ 089830, was responsive to yet another request by Jewelpak for a binding classification ruling. This time, however, Jewelpak included a letter providing a breakdown of the boxes' component materials by weight and by value that was missing before. Customs, determining that the submitted samples were composite goods that should be classified according to the textile or metal that gave the box its essential character, concluded that the boxes could be imported duty-free. The issue was resolved, but the resolution was fleeting.

By letter dated January 27, 1992, Customs issued notice to Jewelpak that it was considering revoking Rulings HQ 086186 and HQ 089830; it granted Jewelpak a 30-day period within which to submit comments regarding the contemplated revocation. Jewelpak submitted two letters opposing revocation and thereafter met with officials of the Office of Regulations and Rulings to present its case. Unpersuaded, Customs revoked the two earlier rulings and concluded that the presentation boxes were properly classifiable as jewelry boxes subject to a 20% *ad valorem* duty rate. In a thorough, nine-page letter, Customs explained that the Explanatory Notes, "the official interpretation of the tariff system at the international level ... mak[e] it clear that cases used in the presentation and sale of jewelry are included in the term 'jewelry boxes' in heading 4202." And because the boxes imported by Jewelpak satisfy the definition of "jewelry boxes" in the Amended Explanatory Note to heading 4202, Customs revoked the earlier rulings:

> The presentation cases classified in HRL 089830 ... are classifiable instead under subheading 4202.92.9020, HTSUSA. The duty rate is 20% *ad valorem* .... This notice to you should be considered a revocation of HRL's 086186 and 089830 under 19 CFR 177.9(d)(1). It is

not to be applied retroactively to HRL's 086186 and 089830 (19 CFR 177.9(d)(2)) and will not, therefore, affect past transactions for the importation of your clients' merchandise under those rulings. However, for the purposes of future transactions in merchandise of this type, these rulings will not be valid precedent. Ruling HQ 951028, March 3, 1993 at 8. After a July 1993 shipment of the subject merchandise imported by Jewelpak was assessed the duty rate prescribed by HTSUS subheading 4202.92.90, in accordance with Customs' ruling letter, Jewelpak filed a complaint in the United States Court of International Trade.

## II

Jewelpak asserted three causes of action before the Court of International Trade, and each is pressed again before us. The first cause of action alleged that Customs' reclassification was improper because the imported merchandise fell outside the common meaning of the term "jewelry box," which purportedly controls its classification. The second cause of action asserted that because Customs had changed its official position with regard to the meaning of the term "jewelry boxes," it therefore violated its own regulations—19 C.F.R. § 177.10(c)(2)—by reclassifying Jewelpak's merchandise without first publishing notice in the Federal Register and providing a notice-and-comment period for interested parties. Finally, the third cause of action alleged that Customs, having at once classified the imported merchandise as packaging even after the Explanatory Note became effective, was thereafter estopped from altering the duty rate until the President, at the recommendation of the International Trade Commission ("ITC"), made modifications to the previously existing duty rates under 19 U.S.C. § 3005.

The case proceeded in piecemeal fashion. On cross-motions for partial summary judgment as to causes of action two

and three, the court granted the government's motion and denied Jewelpak's motion on November 27, 1996. *Jewelpak Corp. v. United States,* 950 F.Supp. 343 (Ct. Int'l Trade 1996) (*"Jewelpak I"*). The court rejected Jewelpak's predicate argument that Customs had an official "position" with respect to jewelry boxes based upon an established and uniform practice, and so the argument that Customs had "changed" positions necessarily failed. *Id.* at 347–48. The court further concluded that Jewelpak was not entitled to summary judgment, even if Customs had changed positions without publication in the Federal Register, because: (1) Jewelpak failed to demonstrate that the change in position had resulted in a restriction or prohibition, as required by 19 C.F.R. § 177.10(c)(2); and (2) in any event, Jewelpak was not prejudiced by the failure to publish because it had *actual* notice of the proposed change. *Id.* at 349–50. Finally, the court rejected Jewelpak's argument that the subject merchandise could only be reclassified through the action of the International Trade Commission or the President of the United States. *Id.* at 352.

Four years later, the court was again faced with cross-motions for summary judgment, this time regarding the remaining cause of action. Finding the existence of a genuine issue of material fact respecting whether the merchandise at issue was suitable for long-term use, the court denied both motions. *Jewelpak Corp. v. United States,* 97 F.Supp.2d 1192 (Ct. Int'l Trade 2000) (*"Jewelpak II"*). In particular, the court concluded that summary judgment was inappropriate because the term was subject to more than one meaning, and therefore the common meaning of "jewelry boxes" was unclear:

The term 'jewelry boxes' is not defined in the tariff itself .... In the dictionaries cited by the parties and others consulted by the court, the term 'jewelry

boxes' is not defined much beyond a box to hold jewelry.... One source has a drawing of a 'jewel box,' showing the type usually stored on a dresser and used to hold multiple pieces of fine jewelry. This is the type of box of which [Jewelpak] believes the government's tariff provision applies. However, one drawing in one source does not outweigh the simple written definition given in numerous sources. Furthermore, this drawing does not imply that boxes which sit on dressers and hold multiple pieces of jewelry are the only type of boxes known as jewelry boxes. Clearly the spectrum ranging from any box that holds jewelry to chests that hold multiple pieces is broad. The common meaning is therefore not clear to the court.

*Id.* at 1195 (internal citations omitted). Therefore, employing the doctrine of *noscitur a sociis,* the court held that whether the merchandise at issue in this case was properly classifiable as "jewelry boxes" turned on whether it was suitable for long-term use.[3] *Id.* at 1197.

After a two-day bench trial in June 2000 in which experts testified for both ·sides, the Court of International Trade concluded that the subject merchandise was in fact suitable for long-term use, and entered judgment for the United States accordingly. *Jewelpak III,* 131 F.Supp.2d at 104. Jewelpak appealed; we have jurisdiction under 28 U.S.C. § 1295(a)(5).

### III

We accord *Skidmore* deference to a Customs tariff classification, affording it a measure of respect commensurate with its power to persuade. *United States. v.*

*Mead Corp.,* 533 U.S. ·218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)); *see also Heartland By-Products, Inc. v. United States,* 264 F.3d 1126, 1133 (Fed.Cir.2001). As Customs' classifications are presumed correct under 28 U.S.C. § 2639(a)(1), the burden of proving that the classification is erroneous rests on Jewelpak. *Baxter Healthcare Corp. of P.R. v. United States,* 182 F.3d 1333, 1337 (Fed.Cir.1999). We review a simultaneous grant and denial of summary judgment' by the Court of International Trade *de novo.* *Russell Stadelman & Co. v. United States,* 242 F.3d 1044, 1048 (Fed. Cir.2001). And while we determine the meaning to be ascribed to HTSUS terms without deference, we review whether a particular import fits within those terms for clear error. *Rollerblade, Inc. v. United States,* 282 F.3d 1349, 1352 (Fed.Cir. 2002).

### IV

Jewelpak essentially raises four arguments before us. First, it asserts that an "established and uniform practice" existed under the TSUS that was carried over to the HTSUS, and therefore Customs was required to publish notice under 19 U.S.C. § 1315 and 19 C.F.R. § 177.10(c)(2) before making any change in that practice. Related to this argument is Jewelpak's contention that it need not show actual prejudice by Customs' failure to publish notice in order to prevail. Third, it argues that the trial court erred by using the wrong standard to determine the common meaning of 'jewelry box." Finally, Jewelpak reasserts its argument that action by the ITC and the President was necessary to

---

**3.** Literally "it is known from its associates," the doctrine of *noscitur a sociis* provides that the meaning of questionable or doubtful words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it. BLACK'S

LAW DICTIONARY 1060 (6th ed.1990). The associated words looked to by the Court of International Trade in this instance were "suitable for long-term use," which appear in the Amended Explanatory Note to Heading 4202, HTSUS.

implement the change in classification of the subject merchandise.

## A

### 1

At the fore in this appeal is the timing of Customs' decision to reclassify Jewelpak's merchandise according to the Amended Explanatory Note to Heading 4202, HTSUS, and whether Customs was required to give notice in the Federal Register. Title 19, Section 1315 of the United States Code governs the effective date of rates of duty for imported articles and, particularly relevant to this appeal, the effective date of administrative rulings that result in higher rates.[4] Jewelpak asserts that an established and uniform practice ("EUP") existed for the subject merchandise under the TSUS that carried over to the HTSUS and remained in effect until at least May 7, 1991, when Customs issued New York Ruling 862417, which Jewelpak alleges attempted to end the EUP.[5] According to Jewelpak, however, "Customs' failure to publish notice of that ruling in the Federal Register precludes that ruling from ending the practice ... which legally continues to this day." We, like the Court of International Trade, fail to find this argument persuasive.

It is of note that with respect to an "established and uniform practice," section 1315(d) speaks only in terms of findings made by the Secretary of the Treasury. Our court has also noted the existence of a judicial gloss on the statute that allows a

finding of a *de facto* EUP, but the requirements for establishing a *de facto* EUP are stringent and the requirements for extinguishing one are not. *See Heraeus–Amersil, Inc. v. United States,* 795 F.2d 1575 (Fed.Cir.1986).

The appellant in *Heraeus–Amersil,* an importer of fused quartz and fused silica, challenged Customs' decision in 1977 to reclassify the imported merchandise under the TSUS (such that it was subject to a duty rate of 25% *ad valorem*) when, for the previous 10–year period, the same merchandise had always been classified under a separate heading (and subject to a duty rate of 7% *ad valorem*). *Id.* at 1577–78. In objecting to the reclassification, Heraeus asserted (among other things) that the merchandise was subject to an established and uniform practice under § 1315(d). The Court of International Trade held that a *de facto* EUP existed at the lower duty rate despite the Secretary of the Treasury not making a finding to that effect; it noted, however, that in the absence of a finding by the Secretary, a *de facto* EUP could be extinguished merely by the discontinuance of the practice—if the importer had actual notice. *See Heraeus–Amersil v. United States,* 617 F.Supp. 89, 94–95 (Ct. Int'l Trade 1985) ("[T]he court does not endorse plaintiff's further contention that Customs is bound ad infinitum by a now discontinued [EUP] unless Customs publishes notice of the change in classification practice .... This result is different from that of the situa-

---

**4.** "No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise *under an established and uniform practice* shall be effective with respect to articles entered for consumption or withdrawn from a warehouse for consumption prior to the expiration of thirty days after the date of publication in the Federal Register of notice of such ruling ...." 19 U.S.C. § 1315(d) (emphasis

added). Thus, according to the terms of the statute, 30–days' notice is required before an administrative ruling may impose a higher rate of duty on merchandise that is under an established and uniform practice.

**5.** New York Ruling 862417 was not issued to Jewelpak, but rather to Unique Packaging Corp., an importer of coin presentation cases from Canada. There is no indication that this ruling was published in the Customs Bulletin.

tion in which the importer bases its claimed classification on a finding ·by the Secretary of the Treasury that an [EUP] existed. Just as an importer's claim may be based on actual uniform practice, so may the claim be extinguished by the discontinuance of such practice.").

■ On appeal, we affirmed that a court may, when faced with sufficient proof, make a judicial determination that a *de facto* EUP existed. We likewise affirmed the trial court's determination that publication in the Federal Register is not the *sine qua non* of extinction of an EUP:

> [I]t was not the intent of Congress when it enacted the § 1315(d) notice provision that, where the Secretary (though requested) failed to decide whether an established and uniform practice existed and that determination had to be made by the court, the lack of a published notice in the Federal Register would bar the application of an administrative change in rates even though the affected importer was specifically informed that Customs had changed its practice. The words of § 1315(d)—which related solely to a change in duties found by the Secretary to have been imposed under an [EUP]—do not so provide, and we know of no sufficient reason why Congress would have desired substantially to prolong the use of a formerly-employed rate known by the particular importer to

have already been abandoned by Customs (which has not itself acknowledged the existence of that practice).

795 F.2d at 1583, 795 F.2d 1575. The facts of the present case track those of *Heraeus–Amersil* quite closely; indeed, when asked at oral argument if the continued vibrancy of *Heraeus–Amersil* would doom his appeal, counsel for Jewelpak responded affirmatively.[6]

■ Both parties agree that, insofar as the Secretary of the Treasury issued no ruling on this matter, if an EUP exists at all, it must be a *de facto* EUP. But as in *Heraeus–Amersil,* the government here denies the existence of an established and uniform practice. That, of course, is not the end of the matter, for if Jewelpak adduced sufficient evidence to the contrary, *compare id.* at 1581–82, the Court of International Trade could so find, even in the face of a blanket denial of an EUP. But ˙no such evidence was adduced and no such finding was made: the Court of International Trade expressly found that Jewelpak had failed to meet its evidentiary burden. *See Jewelpak I,* 950 F.Supp. at 348. Even assuming the existence of an EUP, however, Jewelpak cannot circumvent our decision in *Heraeus–Amersil,* as counsel readily conceded, because it had actual notice of the proposed change well before it was to be ·applied to the subject merchandise.[7]

6. In light of this admission, we note our significant dismay at counsel's failure to cite *Heraeus–Amersil* as controlling (or at the very least, persuasive) authority in his opening brief. Although counsel subjectively may have believed that another case was more persuasive, officers of our court have an unfailing duty to bring to our attention the most relevant precedent that bears on the case at hand—both good and bad—of which they are aware. *See generally* Fed.R.Civ.P. 11; *cf. Beaver v. Grand Prix Karting Ass'n, Inc.,* 246 F.3d 905, 911 n. 2 (7th Cir.2001) (admonishing counsel for relying on precedent that had

been reversed without so indicating, a "failure [that] can result in sanctions.").

7. Our decision in *Hemscheidt Corp. v. United States,* 72 F.3d 868 (Fed.Cir.1995) is not the counterbalance to *Heraeus–Amersil* that Jewelpak would have us believe. We held in *Hemscheidt* that reclassifications under the HTSUS that nullify established and uniform TSUS classifications are subject to the notice requirements of section 1315(d), unless the reclassification is itself compelled by the terms of the HTSUS statute. *Id.* at 872. Although the present case also involves merchandise classified under a certain subhead-

As previously indicated, Customs notified Jewelpak in January 1992 that it was considering revoking the earlier rulings that classified the subject merchandise as something other than jewelry boxes. Jewelpak responded twice with letters and then met with government officials to discuss the proposed revocation. Over one year after providing the notice of proposed revocation, Customs revoked the earlier rulings in March 1993. In so doing, it limited the revocation to future importations; it did not apply retroactively to merchandise that already had been liquidated. The subject merchandise was liquidated by Jewelpak in July 1993, four months after the revocation ruling and some 18 months after the notice of proposed revocation. Under the circumstances, it flies in the face of reason to suggest that Jewelpak was somehow prejudiced, despite its actual knowledge of the change, by Customs' failure to publish notice of the change. *Cf. Heraeus–Amersil,* 795 F.2d at 1583 ("If we accepted Heraeus' point that it is entitled to the application of the lower rates until Customs complies with the § 1315(d) notice provision of publication in the Federal Register, Heraeus could receive a windfall because the lower . . . rate would apply to the [post-revocation] merchandise even though Heraeus knew of Customs' change in classification three years earlier.").

Nevertheless, Jewelpak contends that it need not show actual prejudice by reason of the failure to publish because § 1315(d) requires only that it show "prejudice to the importing public in general, and destruction of the uniformity that section recognizes." We disagree, for such a position is without support in the statute and plainly flouts the rule in *Heraeus–Amersil,* as well as analogous precedents from this and other courts of appeal. *See id.* at 1582; *cf., e.g., Splane v. West,* 216 F.3d 1058 (Fed. Cir.2000) (holding that a legal opinion issued by the general counsel for the Department of Veterans Affairs was not defective, as applied to petitioner, for failing to comply with the publication requirement of FOIA because petitioner had actual notice of the opinion); *Cargill, Inc. v. United States,* 173 F.3d 323, 332 (5th Cir.1999) (concluding plaintiffs had suffered no injury in fact and therefore had no standing, despite agency failure to publish a notice of upcoming meetings in the Federal Register, where plaintiffs had actual notice of and attended the meetings); *New York v. Lyng,* 829 F.2d 346, 354 (2d Cir.1987) (rejecting argument that an agency interpretation was void for violation of APA § 3 for failure to publish in the Federal Register because "the requirement for publication attaches only to matters which if not published would adversely affect a member of the public."). Our decision might well be

---

ing of the TSUS that was reclassified some time after the effective date of the HTSUS, the similarities end there: the government and the importer in *Hemscheidt* agreed that an EUP existed under the TSUS, and—more important—Customs changed its classification in *Hemscheidt* after 20 years without any notice whatsoever to the importer. *See id.* at 869, 870.

Neither do we find persuasive the dissent's suggestion that *Heraeus–Amersil* is distinguishable because the actual or constructive notice exception should be limited to *de facto* EUPs established entirely under the HTSUS. *Post* at 1333. The scheme under which the

practice began—assuming that any practice existed (which we conclude did not in this case)—is in our view irrelevant to determining the adequacy of notice. Where, as here, both the particular importer and the public at large are on notice that Customs has classified merchandise under a particular subheading, an importer cannot claim injury when merchandise falling under that subheading is liquidated at the duty rate set by Customs before the merchandise was even imported; to hold otherwise would grant the importer a windfall and encourage willful ignorance of Customs' classifications. *See Heraeus–Amersil,* 795 F.2d at 1583.

different, then, had Jewelpak not had actual notice of the change; but as that situation is not before us, we—like the *Heraeus–Amersil* court, *see* 795 F.2d at 1583 n. 14—leave it to be answered on another day.

2

■ We likewise reject Jewelpak's contention that Customs was required to publish notice under 19 C.F.R. § 177.10 because it allegedly changed "positions" with respect to the subject merchandise. The Department of the Treasury has promulgated regulations requiring the publication of decisions that result in a change of position by Customs:

> Before the publication of a ruling which has the effect of changing a position of the Customs Service *and which results in a restriction or prohibition,* notice that the position (or prior ruling on which the position is based) is under review will be published in the Federal Register and interested parties given an opportunity to make written submissions with respect to the correctness of the contemplated changes. This procedure will also be followed when the change of position will result in a holding that an activity is not restricted or prohibited and the Headquarters Office determines that the matter is of sufficient importance to involve the interests of the general public.

19 C.F.R. § 177.10(c)(2) (2001). As emphasized, publication in the Federal Register must be predicated upon a change in position *and* a resulting restriction or prohibition. Jewelpak has failed to persuade us in both regards.

A ruling letter is binding only on the party to whom it is issued, and may be revoked or cancelled at any time. *See* 19 C.F.R. § 177.9(a) (2001). A ruling letter that may have broader applicability, however, may be published in the Customs Bulletin, which we have noted previously is a strong indicium of whether Customs has established a position. *See Superior Wire v. United States,* 867 F.2d 1409, 1413 (Fed. Cir.1989) (citing *Nat'l Juice Prods. Ass'n v. United States,* 628 F.Supp. 978, 993–94 (Ct. Int'l Trade 1986)). Against this backdrop, we are unmoved by Jewelpak's assertions that various ruling letters issued between 1988 and 1989 to third parties, and the United States' initial opposition to the proposed Amended Explanatory Note, constitute a "position" of Customs, a rigorous standard to meet. "Customs' establishment of a 'position' would be along the same lines as that of an [EUP] under 19 U.S.C. § 1315(d) (1982), [and therefore] would require uniform liquidations among the many ports over a period of time." *Arbor Foods, Inc. v. United States,* 607 F.Supp. 1474, 1478 (Ct. Int'l Trade 1985); *see also Superior Wire,* 867 F.2d at 1413 (citing with approval *Arbor Foods* ).

■ But even assuming that Customs originally had taken a position, we agree with the government that Customs has not so much changed positions with respect to the subject merchandise as it has reexamined the nature of that merchandise and determined that it should be reclassified based upon its suitability for long-term use. *See, e.g.,* Ruling HQ 951028 ("In your submissions, you take the position that these cases do not fall within the definition of jewelry boxes as set forth in the [Explanatory Notes because] they are not suitable for long-term use .... We disagree with your contention that the cases at issue are not suitable for long term use."); *Jewelpak I,* 950 F.Supp. at 349 ("Customs was free, upon reconsideration, to alter its classification. Customs complied with its regulations and gave notice to Jewelpak, as the 'person to whom the ruling letters [were] addressed,' that Customs was considering revocation of the

HRLs. This case is simply a revocation of an HRL by Customs."). And, despite Jewelpak's protestation, the law is clear that it was wholly appropriate to reference the Amended Explanatory Note (which, in this case, contained the "long-term use" limitation) to help define the proper scope of the tariff term. *See, e.g., Mita Copystar Am. v. United States,* 21 F.3d 1079, 1082 (Fed.Cir.1994) ("[T]he Explanatory Notes of a tariff subheading ... do not constitute controlling legislative history but nonetheless are intended to clarify the scope of HTSUS subheadings and to offer guidance in interpreting subheadings."); *accord N. Am. Processing Co. v. United States,* 236 F.3d 695, 698 (Fed.Cir.2001); *Carl Zeiss, Inc. v. United States,* 195 F.3d 1375, 1378 n. 1 (Fed.Cir.1999).

Jewelpak's claim that Customs violated 19 C.F.R. § 177.10 also fails because it cannot demonstrate that it was subject to a restriction or prohibition. An increased duty rate, however unsavory to Jewelpak, does not in any way restrict or prohibit it from liquidating the imported merchandise; it must show, for example, that its merchandise would be subject to import quotas or other restraints. True, the Director of the Commercial Rulings Division of the Office of Regulations and Rulings issued a March 1989 memorandum indicating that the then-proposed reclassification "would have severe consequences on the administration of quota restraint agreements." Those consequences never materialized, however, because importers were granted visa waivers on jewelry boxes under HTSUS Heading 4202 before the goods in question were imported, such that they were not subject to import quotas, quantitative restraints, or other similar import restraints. *See* J.A. 153–57 (Declaration and Supplemental Declaration of Troy H. Cribb, Deputy Assistant Secretary for Textiles, Apparel, and Consumer Goods Industries, U.S. Department of Commerce).

## B

Jewelpak also challenges the Court of International Trade's determination regarding the common meaning of the tariff term "jewelry box." According to Jewelpak, the common meaning of a tariff term is fixed as of the date of enactment, and the U.S. Congress—rather than the Customs Cooperation Council or the Harmonized System Committee—retains the sole prerogative thereafter to "expand the scope of a tariff term to include articles not previously included therein." Here again, Jewelpak has muddled the distinction between changing the meaning of "jewelry box" and determining whether a particular type of box fits within the properly defined scope of "jewelry box." *See N. Am. Processing Co.,* 236 F.3d at 697 ("Resolution of [whether imported merchandise is properly classified] entails a two-step process: (1) ascertaining the proper meaning of specific terms in the tariff provision; and (2) determining whether the merchandise at issue comes within the description of such terms as properly construed.").

As the trial court noted, the parties agreed: (1) about the design and material make-up of the boxes, and (2) that the boxes were designed to display jewelry in stores and to hold jewelry for the consumer to take home; the only disagreement was whether the boxes were designed to be reused. *See Jewelpak II,* 97 F.Supp.2d at 1194. Following the General Rules of Interpretation of the HTSUS and the relevant case law, the trial court looked to its own understanding, to dictionaries, and to other reliable sources to determine the common meaning of "jewelry boxes." *See id.* at 1195. Recognizing that the Explanatory Notes to the HTSUS were persuasive (but not dispositive) authority on the question of common meaning of tariff terms, *see id.* at 1196, the court concluded

that a genuine issue of material fact existed precluding the entry of summary judgment: "Since the boxes do appear to literally fit the dictionary definition of a box that holds jewelry, they are classifiable under subheading 4202. [Yet the] court is unable to reconcile such reasoning with the Explanatory Notes and, more importantly, with the context of the subheading." *Id.* at 1195. In particular, the court concluded, correctly in our view, that whether the subject merchandise was properly categorized under heading 4202 turned on whether it was suitable for long-term use. At trial, the court heard testimony from at least five witnesses, including three experts, and made findings of fact crediting some witnesses' testimony and discrediting others. *See Jewelpak III,* 131 F.Supp.2d at 101–04.

The analysis employed by the Court of International Trade to discern the common meaning of the tariff term "jewelry boxes" was cogent and sound. We hold its conclusions were correct. In addition, Jewelpak has failed to meet its burden and direct our attention to any error, much less clear error, in the court's finding that the subject merchandise was properly classified under HTSUS subheading 4202.92.90.

### C

We have carefully considered Jewelpak's remaining arguments—that action by the ITC and the President was necessary, under 19 U.S.C. §§ 3005 and 3006 respectively, to implement the alleged change in classification of the subject merchandise—and find them to be without merit.

### V

We conclude under *Skidmore* that Customs' tariff classification for the subject boxes is highly persuasive. Moreover, the Court of International Trade's finding that the subject merchandise is suitable for long-term use is not clearly erroneous, as its finding was based on the credibility assessment of contending witnesses. Finally, we conclude that Jewelpak was not prejudiced by Customs' failure to publish the revocation letter in the Federal Register because Jewelpak had actual notice of the proposed change and had numerous opportunities to respond. Accordingly, we affirm in all respects the decision of the Court of International Trade granting judgment for the United States.

*AFFIRMED.*

GAJARSA, Circuit Judge, dissenting.

I respectfully dissent. The panel majority affirms a decision by the United States Court of International Trade allowing the United States Customs Service ("Customs") to reclassify Jewelpak's presentation boxes as "jewelry boxes" under subheading 4202.92.90 of the Harmonized Tariff Schedule of the United States ("HTSUS") and ordering Customs to liquidate that merchandise at a rate of 20 percent *ad valorem.* In my judgment, Customs was required to provide notice by publication in the Federal Register of its decision to reclassify this merchandise under subheading 4202. Section 1315(d) of Title 19 of the United States Code requires publication in the Federal Register of notice of a ruling when, as here, the decision departs from an established and uniform practice ("EUP") and will result in the imposition of a higher tariff rate. Under such circumstances, § 1315(d) provides that the administrative ruling imposing the higher duty rate will be ineffective "prior to the expiration of thirty days after the date of publication in the Federal Register of notice of such a ruling." 19 U.S.C. § 1315(d) (2000). Customs failed to provide the statutorily required public notice. I would therefore reverse and remand for classification of Jewelpak's merchandise at the tariff rate Customs initially assessed.

This court's decision in *Hemscheidt Corp. v. United States*, 72 F.3d 868 (Fed. Cir.1995), should control the outcome of this case. In *Hemscheidt*, we held that "[r]eclassifications under the HTSUS that nullify established and uniform TSUS classifications are subject to the notice requirements of section 1315(d), unless the reclassification is itself compelled by the terms of the HTSUS statute." 72 F.3d at 871.

Reclassification under the HTSUS that nullified an established and uniform practice, or EUP, that was in place under the former statute, the Tariff Schedule of the United States ["TSUS"], is precisely what occurred with respect to Jewelpak's presentation boxes. Under the TSUS, Jewelpak's boxes were consistently classified as packaging according to their component of chief value. Thus, under *Hemscheidt*, unless the reclassification of Jewelpak's boxes under Heading 4202 was mandated by the HTSUS, Customs was required to provide public notice pursuant to § 1315(d).

The HTSUS did not mandate reclassification of Jewelpak's merchandise as jewelry boxes under Heading 4202. For at least one year after the HTSUS became effective on January 1, 1989, Customs continued consistently to classify boxes such as those at issue as packaging. Under the packaging classification that was in place under the TSUS and for at least one year under the HTSUS, the duty rate varied from three percent *ad valorem* to zero. It was not until several years later, in 1993, that Customs reclassified Jewelpak's merchandise under Heading 4202, and liquidated it at a rate of twenty percent *ad valorem*. That similar boxes were consistently classified as packaging for at least one year under the HTSUS strongly suggests that the terms of the HTSUS mandated neither the reclassification of Jewelpak's boxes as jewelry boxes under Heading 4202, nor the resulting imposition of the higher duty rate.

An examination of the text and legislative history of the HTSUS confirms that the statute did not mandate this reclassification. The text of the HTSUS and its legislative history fail to define the phrase "jewelry box," and the phrase does not clearly encompass presentation boxes such as those at issue. Rather, as the Court of International Trade noted, the meaning of "jewelry box" is ambiguous. *Jewelpak Corp. v. United States*, 97 F.Supp.2d 1192, 1195 (Ct. Int'l Trade 2000) ("Clearly the spectrum ranging from any box that holds jewelry to chests that hold multiple pieces is broad. The common meaning is therefore not clear to the Court."). Prior to the amendment to the explanatory notes, which took effect on January 1, 1990, one year after the enactment of the HTSUS, the statutory phrase "jewelry box" was implicitly construed to exclude boxes such as Jewelpak's presentation boxes, which are not sold to consumers for the primary purpose of storing jewelry. At the very least, the statutory text of the HTSUS did not mandate a broader definition. By reinterpreting the meaning of "jewelry box" according to the amended explanatory note, Customs expanded the definition beyond the statutory mandate. According to the amended explanatory note, "jewelry box" means any box that both holds jewelry and is suitable for long-term use.

Although the explanatory notes are not binding, Customs is certainly permitted to consult them. The criterion proffered in the note may be the correct interpretation—or at least, a permissible interpretation—of the phrase "jewelry box." Nevertheless, although the classification of any boxes designed to hold jewelry and suitable for long-term use may be a correct classification, Custom's decision to reclassify Jewelpak's boxes because they met Cus-

toms' revised interpretation of the scope of the statutory phrase "jewelry box" was a reclassification under the HTSUS that nullified an established and uniform TSUS classification.[1] Because the reclassification was not compelled by the terms of the HTSUS, the notice requirements of § 1315(d) apply. *See Hemscheidt,* 72 F.3d at 871.

The majority distinguishes *Hemscheidt* on the grounds that in that case, the importer lacked actual notice of the reclassification. It then holds that where the Secretary of the Treasury has failed to issue a ruling, and therefore an EUP exists, if at all, only by *de facto* court recognition, actual notice directed only to the importer of Customs' intent to reclassify the merchandise at issue satisfies the notice requirement of § 1315(d). To support this holding, the majority relies on this court's pre-HTSUS decision in *Heraeus–Amersil, Inc. v. United States,* 795 F.2d 1575 (Fed.Cir. 1986).[2] I would not distinguish *Hemscheidt* on the basis that the importer in that case lacked actual notice, because the court's rationale in *Hemscheidt* was unrelated to the particular importer's actual notice or the putative lack thereof. *See* 72 F.3d at 872 (stating that common sense and legal sense supported the court's interpretation of § 1315(d) and that "[t]he loss of income to the federal treasury from the 'free levy,' in the large, must be small compared to the price of destruction of established and uniform classification practices upon which predictable international trade depends"). Moreover, *Heraeus–Amersil,* which created the actual notice exception on which the majority relies, is both erroneous, and inapplicable to the present case.

In *Heraeus–Amersil,* this court found that § 1315(d) imposed no requirement of notice in the Federal Register for a reclassification that altered an EUP because the practice at issue had not been recognized as an EUP by the Secretary of the Treasury and because the importer had actual notice of the proposed reclassification. 795 F.2d at 1582–83. The court created an "actual or constructive notice" exception to § 1315(d) for EUPs that exist by *de facto* judicial recognition rather than by a formal finding by the Secretary of the Treasury. In so doing, the court reasoned that:

> [I]t was not the intent of Congress when it enacted the § 1315(d) notice provision that, where the Secretary (though requested) failed to decide whether an established and uniform practice existed and that determination had to be made by the court, the lack of a published notice in the Federal Register would bar

and uniform practice under the TSUS. In this respect, this case is identical to *Hemscheidt.*

---

1. The government disputes the existence of an EUP for the period beginning in 1990, but "[i]t is uncontested that under the [TSUS], the boxes were classified according to their component of chief value." *Jewelpak,* 96–189. The government's arguments regarding the absence of an EUP are directed entirely to liquidations occurring more than one year after the effective date of the HTSUS. The government does not contest that for more than two decades during which the TSUS was in effect, boxes such as those at issue were classified as packaging. As Jewelpak contended in its opening brief, this constitutes an established and uniform practice. The government's failure to argue to the contrary is a concession that Customs had an established

2. I share the majority's conviction that counsel, as court officers, must call our attention to precedent of which they are aware when it is so relevant as to be potentially controlling. They must do so even if that precedent is harmful to their position. I am less dismayed than the majority in this case, however, because Jewelpak included *Heraeus–Amersil* in the Table of Authorities in its opening brief, and also mentioned the case on page 15 of its opening brief in the context of admitting that the requirements for showing an established and uniform practice are "stringent."

the application of an administrative change in rates even though the affected importer was specifically informed that Customs had changed its practice. The words of § 1315(d)—which relate solely to a change in duties found by the Secretary to have been imposed under an established and uniform practice—do not so provide, and we know of no sufficient reason why Congress would have desired substantially to prolong use of a formerly-employed rate known by the particular importer to have already been abandoned by Customs (which has not itself acknowledged the existence of that practice).

*Heraeus–Amersil,* 795 F.2d at 1583. The court went on to state that requiring notice in the Federal Register would be improper because the importer "could receive a windfall" because the lower duty rate would apply despite the importer's actual knowledge of Customs' reclassification. *Id.*

This reasoning is unpersuasive. Where the Secretary has found an established and uniform practice, § 1315(d) explicitly requires Customs to provide notice in the Federal Register notwithstanding any potential windfall to an importer who possesses actual knowledge of the impending reclassification. Section 1315(d) provides that:

> No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption ... prior to the expiration of *thirty days of publication in the Federal Register of notice of such ruling.*

19 U.S.C. § 1315(d) (2000) (emphasis added). The statute contains no "actual or constructive notice" exception. The re-

sulting potential "windfall" is largely contained, because "if Customs wishes to levy at the increased rate, it is burdened only by the making of a classification according to the rules and giving 30 days notice of its decision." *Hemscheidt,* 72 F.3d at 872. Thus, the resulting burden on Customs, if any, is minimal.

In contrast, there is a substantial benefit to the international trade community from Customs' compliance with the public notice requirement of § 1315(d). The community benefits from the efficient trade that results when the investing community relies on established and uniform practices, knowing that Customs will provide public notice prior to imposing higher duty rates. *See id.* (noting that the purpose of § 1315(d) was to protect reliance interests). The international trade community premises its actions and decisions on the expectation that Customs will conform to its established and uniform practices. Section 1315(d) facilitates such reliance by requiring Customs to provide notice before departing from its EUPs in order to assess higher tariffs. The public notice requirement of § 1315(d) also serves the critical function of promoting uniformity in the duty rates assessed to like goods. This ensures fairness to the importing community.

In *Heraeus–Amersil* the court recognized that these interests are implicated when Customs engages in established and uniform practices, even when the Secretary of the Treasury fails formally to recognize them as such. *Heraeus–Amersil,* 795 F.2d at 1582. This determination was correct. The reliance and fairness interests of the international importing community are implicated by the practices in which Customs uniformly engages. This is so regardless of whether the Secretary formally deems Customs' practice established and uniform. Moreover, the statu-

tory language does not exclude courts from determining that Customs engaged in an EUP where the Secretary should have made such a finding but declined to act in response to a request. *See* 19 U.S.C. § 1315(d) (2000) ("No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective...."). Thus, the decision in *Heraeus–Amersil* was correct insofar as the court determined that *de facto* EUPs implicate § 1315(d).

In contrast, the reasoning employed by the court in *Heraeus–Amersil* in allowing actual or · constructive notice to suffice when Customs departs from a judicially recognized *de facto* EUP is inconsistent with the court's recognition that § 1315(d) may encompass *de facto* EUPs in the first instance. In creating an actual or constructive notice exception for *de facto* EUPs, the *Heraeus–Amersil* decision sacrificed the reliance and fairness interests served by § 1315(d) for the sake of rigid textualism. The court held that, in the event of *de facto* EUPs, actual or constructive notice to the particular importer was sufficient because the statutory text failed to mandate publication in the Federal Register unless the Secretary found an established and uniform practice. *Heraeus–Amersil*, 795 F.2d at 1583. It then stated that it knew of no reason to impose a public notice requirement where the importer had actual notice that Customs was abandoning its previous practice. *Id.* But earlier in the opinion, and despite explicitly noting the reference in the statutory text to a higher duty rate *"than · the Secretary of the Treasury shall find to have been applicable* to the imported merchandise under an established and uniform practice ...," *id.* at 1582, the court stated that:

> In enacting [§ 1315(d) ], Congress recognized that the importing community relies upon the existence of established and uniform practices in conducting their business.... Similarly, *where an established and uniform practice has been judicially found* (because Customs refused to pass· on that issue) *to classify particular merchandise under a specific tariff provision, the importing community should be afforded a grace period to permit it to make business decisions in light of any new agency action changing that practice.*

*Id.* (emphases added). The *Heraeus–Amersil* decision was correct to recognize that § 1315(d) applies where the court finds that Customs had an established and uniform practice, even if the Secretary of the Treasury has failed to do so. The court recognized that importers rely on established and uniform practices regardless of the Secretary's willingness to acknowledge them formally, and that § 1315(d) protects this reliance interest. The decision also correctly recognized that the importing community has an interest in receiving public notice.

The *Heraeus–Amersil* decision erred, however, in failing to ensure that Customs provide notice to the entire importing community. Either § 1315(d) applies to *de facto* EUPs or it does not. When it applies, whether by virtue of a *de facto* EUP or one formally recognized by the Secretary, the notice requirement of the statute is triggered. The notice requirement is satisfied· only by publication in the Federal Register of the administrative reclassification for at least thirty days prior to the effective date the reclassification. Instead of following its initially sound reasoning to this logical conclusion, the *Heraeus–Amersil* court focused on the lack of textual support for the imposition of a public notice requirement where "the affected importer was specifically informed that Customs had changed its practice." *Id.* at 1583. Were the question before us in the

first instance, I would not have imposed this "actual or constructive notice" exception to § 1315(d). The same reasons that prompted the *Heraeus–Amersil* court to recognize that § 1315(d) encompasses judicially recognized *de facto* established and uniform practices counsel in favor of applying the statute's public notice requirement. "Actual or constructive notice" is insufficient to protect the interests of the importing community. Section 1315(d) was intended to protect their interests as a community, not merely the interests of a particular importer. The statute admits of a reasonable interpretation that is consistent with this purpose. The court, in *Heraeus–Amersil*, should have held that § 1315(d) requires public notice in the event the court recognizes that Customs intends to depart from an EUP that the Secretary should have recognized but did not.

This panel, of course, cannot overrule *Heraeus–Amersil, see Tate Access Floors, Inc. v. Interface Architectural Res., Inc.,* 279 F.3d 1357, 1366, 61 USPQ2d 1647, 1653 (Fed.Cir.2002) (citing *Vas–Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1563, 19 USPQ2d 1111, 1117 (Fed.Cir.1991); *Kimberly–Clark Corp. v. Ft. Howard Paper Co.,* 772 F.2d 860, 863, 227 USPQ 36, 37 (Fed.Cir.1985)); however, *Heraeus–Amersil* is clearly distinguishable. This court decided *Heraeus–Amersil* more than two years before the HTSUS went into effect. The statutory shift is significant because the differences in tariff rates between the TSUS and the HTSUS were supposed to be minimal. The change from the TSUS to the HTSUS was intended to be essentially revenue-neutral. *See President's Guidelines for Converting the Tariff Schedules of the United States to the Harmonized System,* 46 Fed.Reg. 47897–02, 47897 (Sept. 30, 1981) (instructing Commission to avoid "to the extent practicable and consonant with sound nomenclature principles, changes in the rates of duty on

individual products"); H.R. Conf. Rep. No. 100–576, 100th Cong., 2d Sess. 548 (Apr. 20, 1988), *available in* 1988 USCCAN 1547, 1581 ("The conferees believe that the HTS fairly reflects existing tariff and quota treatment and that the conversion is essentially revenue-neutral."). In fact, Conversion Reports issued by the International Trade Commission provide a strong indication that the transition from the TSUS to the HTSUS was intended to be revenue-neutral with respect to the particular merchandise at issue. *See, e.g.,* U.S.I.T.C., *Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature Structure of the Harmonized System,* Rep. on Investigation No. 332–131 Under § 332 of the Tariff Act of 1930, Annex II: Cross–Reference From Present TSUSA to Converted Tariff Schedule (June 1983) (showing all goods previously classified under TSUS Item 640.30.10, duty free, reclassified under Heading 7310, duty free, not under Heading 4202).

Ensuring that the HTSUS remains revenue neutral is more than a "sufficient reason why Congress would have desired substantially to prolong use of a formerly-employed rate known by the particular importer to have already been abandoned by Customs" absent compliance with the public notice requirement of § 1315(d), that the court found absent in *Heraeus–Amersil.* I would therefore limit the actual or constructive notice exception to those *de facto* established and uniform practices that were established entirely under the HTSUS, not to those that were in place under the TSUS. The enactment of a new statutory regime, the HTSUS, that Congress intended to be essentially revenue neutral, provides a strong rationale for adhering to the rule announced in *Hemscheidt,* namely, that "[r]eclassifications under the HTSUS that nullify established and uniform TSUS classifications are sub-

ject to the notice requirements of section 1315(d), unless the reclassification is itself compelled by the terms of the HTSUS statute." 72 F.3d at 871. Section 1315(d) requires notice by publication in the Federal Register; actual notice to the particular importer is insufficient to satisfy the requirements of the statute.

Under the TSUS, Jewelpak's presentation boxes were consistently classified as packaging according to their component of chief value, and were imported at substantially lower duty rates. Customs' reclassification of Jewelpak's boxes as "jewelry boxes" under Heading 4202 was not mandated by the terms of the HTSUS. That reclassification resulted in a higher duty rate, which Customs imposed without providing 30 days of prior public notice in the Federal Register. Customs violated § 1315(d) by so doing. Because Customs failed to provide public notice in the Federal Register for thirty days, this reclassification, and the accompanying imposition of the twenty percent duty rate, should have been ineffective. I therefore respectfully dissent.