**Slip Op. 06-105**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | | |
|---|---|---|
| _____ | : | |
| | : | |
| METCHEM, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | Before:      Jane A. Restani, Chief Judge |
| v. | : | |
| | : | Court No.     04-00238 |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| _____ | : | |

**OPINION**

[Judgment for plaintiff in tariff classification action.]

Dated: July 14, 2006

Fitch, King and Caffentzis (James Caffentzis) for plaintiff.

Peter D. Keisler, Assistant Attorney General, Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Saul Davis); Michael W. Heydrich, Office of the Assistant Chief Counsel, United States Bureau of Customs and Border Protection, of counsel, for defendant.

Restani, Chief Judge: This matter is before the court following trial. Plaintiff MetChem, Inc. ("MetChem") challenges the classification for tariff purposes of its imported product. The United States Bureau of Customs and Border Protection ("Customs") classified the imported product as nickel carbonate under Harmonized Tariff Schedule of the United States ("HTSUS") subheading 2836.99.50.[1] Plaintiff asserts that the proper classification is under

---

[1] The relevant portion of the HTSUS Chapter 28 reads as follows:

2836         Carbonates; peroxocarbonates (percarbonates); commercial ammonium carbonate containing ammonium carbamate:

(continued...)

subheading 750l.20.00, i.e., nickel oxide sinters and <u>other intermediate products of nickel metallurgy</u>.[2]

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1581(a) (2000) (protest denial jurisdiction).  The proper construction of a tariff provision is an issue of law.  <u>Carl Zeiss, Inc. v. United States</u>, 195 F.3d 1375, 1378 (Fed. Cir. 1999).  Determination of the nature of a good, in order to place it in the proper tariff category, is an issue of fact.  <u>Id.</u>  Both determinations are made <u>de novo</u> in the trial court.  <u>Nat'l Advanced Sys. v. United States</u>, 26 F. 3d 1107, 1109 (Fed. Cir. 1994).

## BACKGROUND

The entries of the imported merchandise at issue were made on March 13, 2003 (Entry No. 336-4250617-6), and March 28, 2003 (Entry No. 336-4251340-4).  An earlier entry, which the parties seem to agree was identical in all relevant respects to the entries at issue, was

---

[1](...continued)

. . .
  Other:

. . .
2836.99   Other:

. . .
2836.99.50    Other . . .

[2] The relevant portion of the HTSUS Chapter 75 reads as follows:

7501   Nickel mattes, nickel oxide sinters and other intermediate
    products of nickel metallurgy:

    . . .
7501.20.00    Nickel oxide sinters and other intermediate
    products of nickel metallurgy . . .

analyzed by the Customs and Border Protection Laboratory.  See Customs Laboratory Report,

Pl.'s Exhibit ("P. Ex.") 5.  The report describes the merchandise as basic nickel carbonate,

represented by the formula ($xNiCO_3 * yNi(OH)_2 * zH_2O$), which is essentially a mixture of nickel

carbonate, nickel hydroxide, and bound water.  Id.  Nickel carbonate ($NiCO_3$) invariably contains

49.5% nickel due to the requirements of its molecular structure.  Id.  According to the report, the

merchandise at issue contains somewhere in the range of 52% to 55% nickel, while dehydrated

basic nickel carbonate can contain up to 57.9% nickel.[3]  Id.  The report states that "[t]he product

is used as an intermediate in the production of nickel metal," and that it "cannot be sold as nickel

carbonate."  Id.  A laboratory report for other later entries, also not before the court, and which

resulted in a Customs ruling adverse to plaintiff,[4] states that the product is basic nickel carbonate,

but also states that the material is identical with nickel carbonate (basic) and nickel hydroxide

tetrahydrate.  Def.'s Exhibit ("D. Ex.") C.

        The parties are in agreement that commercially and as invoiced, the product at

issue is known as basic nickel carbonate and is represented by P. Ex. 1, a clumpy greenish

---

[3] The report described the sample of basic nickel carbonate as containing 54% nickel and approximately 33% moisture.  Id.

[4] HQ Ruling 966405 (Nov. 3, 2003) describes the basic nickel carbonate as ($NiCO_3 * 2Ni(OH)_2 * 4H_2O$), which appears to be a mixture of two salts and water.  (D. Ex. D).  The ruling's discussion as to how one obtains pure nickel carbonate would seem to add no support to its conclusion that this mixture is classified as a carbonate.  HQ Ruling 965780 (Oct. 2, 2002) is also less than illuminating and merely states that basic nickel carbonate is a chemical compound without relating it to the definition of the Chapter Explanatory Notes with respect to compounds, or any chemical dictionary definition of compound.  (D. Ex. E); see, e.g., Hawley's Condensed Chemical Dictionary 289 (14th ed. 2001) (defining "compound" as "[a] substance composed of atoms or ions of two or more elements in chemical combination . . . where the elements have definite proportions by weight and are represented by a chemical formula").

powder.  See Pl.'s Post-Trial Brief (P. Br.) at 4; Def.'s Post-Trial Brief (D. Br.) at 3.  The parties

also do not dispute that the imported product is drawn directly from an intermediate step in the

Caron process, a hydro-metallurgical process for producing nickel oxide sinter, a product used in

specialty steel production.  P. Br. at 2; D. Br. at 3.  While it is clear that the imported product is

not a metal or metal alloy, it is a product with higher nickel content than pure nickel carbonate,

and the Caron process is used to create this higher nickel content product.  R. 38–9; D. Ex. H,

col. 1, lines 19–22 (Patent for Caron process).

## DISCUSSION

For a proper classification of merchandise entering the United States, the court

turns to the General Rules of Interpretation ("GRIs") of the HTSUS.  See Orlando Food Corp. v.

United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998).  "The structure of the GRI controls the

point at which each rule comes into play." Pillowtex Corp. v. United States, 171 F.3d 1370,

1374 (Fed. Cir. 1999).  Under GRI 1, HTSUS, "classification shall be determined according to

the terms of the headings and any relevant section or chapter notes," while the other GRI

provisions may be consulted only if the headings and notes "do not otherwise require" a

particular classification.  Pursuant to GRI 3(a), HTSUS, "[w]hen . . . goods are, prima facie,

classifiable under two or more headings . . . [t]he heading which provides the most specific

description shall be preferred to headings providing a more general description."

Thus, the court first considers whether the basic nickel carbonate at issue is prima

facie classifiable under HTSUS heading 2836 and/or 7501.  As to heading 7501, there is no

dispute that in the common sense of the term, the basic nickel carbonate at issue is an

"intermediate product of metallurgy."[5]  One of defendant's arguments seems to be despite the ordinary meaning of this term, basic nickel carbonate is excluded from heading 7501 because it is not a nickel oxide.  Presumably, this view is based on Explanatory Note 75.01, which describes intermediate products of nickel metallurgy to include impure nickel oxides, impure ferro-nickel, and nickel speiss, but does not refer to basic nickel carbonate.  World Customs Organization, Harmonized Commodity Description & Coding System Explanatory Notes, Explanatory Note 75.01, 1302 (3d ed. 2002) ("Explanatory Notes").  This is a rather weak argument based on the principle of inclusio unius est exclusio alterius, applied not to the words of a statute, but to a non-binding Explanatory Note.[6]  The argument is further weakened because the product at issue is removed during a process that results in nickel oxide sinters, which are specifically included in heading 7501, HTSUS, and are for steel-making purposes.  Thus, it is very difficult to say that the product at issue is not an intermediate product of metallurgy, even provided that Explanatory Note 75.01 does not refer to basic nickel carbonate.

Defendant's real argument is that even if the product at issue is described in heading 7501, it is also described in heading 2836 because it is a carbonate, and that this is the more specific heading.  The problem with this argument is that it relies on GRI 3(a) analysis of relative specificity when GRI 1 analysis is not exhausted.  See Cummins Inc. v. United States,

---

[5] Metallurgy generally is the science of extracting metal or metal products from ores. Webster's Third New Int'l Dictionary 1420 (3d ed. 1981); see also R. 49 (stating that "metallurgy is the processing of mineral ores to produce metal products").

[6] "Although the Explanatory Notes are not legally binding or dispositive, they may be consulted for guidance and are generally indicative of the proper interpretation of the various HTSUS provisions."  See North Am. Processing Co. v. United States, 236 F.3d 695, 698 (Fed. Cir. 2001).

377 F. Supp. 2d 1365, 1371 (CIT 2005) (stating that subsequent GRIs may only be applied after GRI 1 is exhausted). Generally, the HTSUS is not designed so that the headings overlap; therefore, a GRI 1 analysis should be a searching one. The court does not reach Rule 3(a) unless it is satisfied that headings 7501 and 2836 both cover the article. Orlando Food, 140 F.3d at 1440. Thus, under a GRI 1 analysis, the court gives careful consideration to whether the basic nickel carbonate at issue is prima facie classifiable as a "carbonate" under HTSUS 2836.

Defendant contends that the tariff term "carbonate" is an eo nomine term, and normally should cover all forms of carbonates, unless there are HTSUS section or chapter notes that limit the scope of that term, or the tariff description itself clearly limits the scope of the term. See Carl Zeiss, 195 F.3d at 1379. Defendant argues that the record shows unequivocally that the subject merchandise is a basic nickel carbonate, which falls within the scope of the term "carbonate" for the purpose of HTSUS 2836. To the contrary, the court concludes that under a GRI 1 analysis the basic nickel carbonate at issue is not classifiable as a carbonate under heading 2836 because the term "carbonate" in Chapter 28 is limited by the chapter notes.

Pursuant to Chapter Note 1(a) to Chapter 28, HTSUS, Chapter 28 applies only to "[s]eparate chemical elements and separate chemically defined compounds, whether or not containing impurities," unless the context otherwise requires. In the instant case, it is apparent that the basic nickel carbonate at issue is not a "separate chemical element." The parties may have assumed, however, that the basic nickel carbonate at issue is a "separate chemically defined compound" without giving proper consideration to the meaning of the term.[7] See R. 42 (stating

_____

[7] The parties did not brief this issue or focus on it at trial. Both parties are obliged to alert
(continued...)

that basic nickel carbonate "could be considered a chemical compound," keeping in mind that

"there's a whole range of basic nickel carbonates") (testimony of plaintiff's witness John Reid).

The court concludes that the basic nickel carbonate at issue is not a "separate chemically defined

compound" within the meaning of Chapter Note 1(a).

Under the HTSUS, the court construes terms "according to their common and

commercial meanings, which are presumed to be the same absent contrary legislative intent."

Len-Ron Mfg. Co. v. United States, 334 F.3d 1304, 1309 (Fed. Cir. 2003).   Further, "the court

may rely on its own understanding of the term as well as upon lexicographic and scientific

authorities," and "[t]he court may also refer to the Explanatory Notes accompanying a tariff

subheading."  Id.  Here, in construing the term "separate chemically defined compound," the

court looks to the Explanatory Notes to Chapter 28, which provide a definition as follows:

> A separate chemically defined compound is a substance which
> consists of one molecular species (e.g., covalent or ionic) whose
> composition is defined by a constant ratio of elements and can be
> represented by a definitive structural diagram.  In a crystal lattice, the
> molecular species corresponds to the repeating unit cell.
> The elements of a separate chemically defined compound combine
> in a specific characteristic proportion determined by the valency and the
> bonding requirements of the individual atoms.  The proportion of each
> element is constant and specific to each compound and it is therefore said
> to be stoichiometric.

Explanatory Notes, General Explanatory Note to Chapter 28, 260.  This definition is consistent

with lexicographic authorities on the subject.  See USR Optonix, Inc. v. United States, 362 F.

---

[7](...continued)
the court to relevant law, even if it is unfavorable to their position.  The court must find the
proper classification.  Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984).  The
parties must aid the court in this endeavor.

Supp. 2d 1365, 1370 n.3 (CIT 2005) (defining the HTSUS terms "chemical compound" and "separate chemically defined compound" narrowly to refer to "a substance composed chemically of two or more elements in definite proportions (as opposed to a <u>mixture</u>)") (citing <u>Oxford English Dictionary</u> 629, vol. III (2d ed. 1989)); <u>see also</u> <u>Hawley's Condensed Chemical Dictionary</u> 289 (14th ed. 2001).  Thus, relying on the Explanatory Notes, lexicographic authorities, and the court's understanding of the term, we recognize that for the purpose of Chapter 28 a "separate chemically defined compound" is a substance composed chemically of two or more elements in definite proportions.

In the instant case, the basic nickel carbonate at issue does not meet this definition of "separate chemically defined compound."  Whereas chemical compounds nickel carbonate ($NiCO_3$), nickel hydroxide ($Ni(OH)_2$), and water ($H_2O$) each possess a constant ratio of elements, the basic nickel carbonate at issue is a variable mixture of nickel carbonate, nickel hydroxide, and water, which may be represented by a broad range of chemical formulas.  <u>See</u> D. Ex. F at 7 (stating that the most common forms of basic nickel carbonate "range from $2NiCO_3$ x $3Ni(OH)_2$ x $XH_2O$ to $NiCO_3$ x $Ni(OH)_3$ x $XH_2O$").  Basic nickel carbonate will always have at least one ($NiCO_3$) and one ($Ni(OH)_2$), although potentially more than one of each.  R. 43.  If it is hydrated, the basic nickel carbonate will also contain at least one ($H_2O$).  <u>Id.</u>  Such a mixture of compounds does not fall within the definition of "separate chemically defined compound."  <u>See</u> <u>USR Optonix</u>, 362 F. Supp. 2d at 1374 (concluding that a mixture of "yttrium oxide containing an indeterminate amount of europium," represented by the formula Y[2]O[3]: Eu, "does not conform to the Explanatory Note definition of 'separate chemically defined compound'").

Moreover, the variable components are not classifiable as allowable impurities for the purpose of Chapter 28.[8] MetChem manufactures basic nickel carbonate with the intent to increase the nickel content of the substance and decrease the amount of impurities. See R. 38–39 (Plaintiff's main expert, John Reid, Ph.D. (metallurgy), explained the production advantages to the metallurgical process of higher nickel content and a lower level of impurities.); R. 64–66 (Plaintiff's president and trial witness, Thomas Cirigliano, also noted the higher nickel content of this product, and $Ni(OH)_2$ (nickel hydroxide) as a normal part of the product.). As defendant itself observes, nickel hydroxide will be part of the higher nickel content product. D. Br. at 3; R. 43. The nickel hydroxide is deliberately left in the product, and therefore does not satisfy the Explanatory Note definition of impurity. Moreover, plaintiff's witness John Reid described the impurities that Metchem sought to minimize as cobalt, manganese, and sulphur. See R. 39 (Defendant's counsel helped the witness list the impurities, and surely would have suggested "nickel hydroxide" or "nickel hydroxide tetrahydrate" if they were allowable impurities.).

Finally, this is not a case in which "the circumstances otherwise require" the subject merchandise at issue to fall under Chapter 28. The Explanatory Note (C) to Chapter 28 states that "[t]here are certain exceptions to the rule that this Chapter is limited to separate

---

[8] Chapter Notes 1(a) and (b) to Chapter 28, HTSUS, allow for products of this chapter to be dissolved in water and to contain certain impurities. The Explanatory Note (A) to Chapter Note 1 to Chapter 28 provides that:

> The term "impurities" applies exclusively to substances whose presence in the single chemical compound results solely and directly from the manufacturing process (including purification) . . . . When . . . substances are deliberately left in the product with a view to rendering it particularly suitable for a specific use rather than for general use, they are not regarded as permissible impurities.

Explanatory Notes, Explanatory Note (A) to Chapter Note 1 to Chapter 28, 261.

chemical elements and separate chemically defined compounds." <u>Explanatory Notes</u>, Explanatory Note (C) to Chapter 28, 262. The Explanatory Note lists the mixtures (as opposed to compounds) that are specifically permitted as exceptions to the general statutory provision permitting only elements and compounds in Chapter 28. <u>Id.</u> at 262–63; <u>see</u> <u>also</u> <u>USR Optonix</u>, 362 F. Supp. 2d at 1375 n.7 (holding that even though the mixture of yttrium oxide and europium is not a "separate chemically defined compound," heading 2846 provides an exception for "Compounds, inorganic or organic, of rare-earth metals, of yttrium or of scandium or of mixtures of these metals"). Listed for heading 2836 is "Commercial ammonium carbonate containing ammonium carbamate." <u>Explanatory Notes</u>, Explanatory Note (C) to Chapter 28, 263. Commercial or basic nickel carbonate is not listed as a permitted mixture. <u>Id.</u>

In sum, there was no evidence cited to the court that the mixture at issue was really a compound or simply a compound with impurities, or that the context requires classification of this non-compound in Chapter 28. In fact, the parties agreed that the basic nickel carbonate could take various forms. <u>See</u> R. 42–4. Therefore, it cannot be a "chemical compound" with a constant ratio of elements, as required by the HTSUS Chapter 28. Thus, the product at issue must be classified for what it was proved to be – a mixture of salts and water, not classifiable under heading 2836.

## CONCLUSION

The imported product is an intermediate product of nickel metallurgy. It is

covered by heading 7501, HTSUS, and described by subheading 7501.20.00, HTSUS, because it

is an intermediate product of nickel metallurgy. It is not covered by heading 2836, HTSUS.

Judgment will enter for plaintiff.


        /s/ Jane A. Restani     
         Jane A. Restani
          Chief Judge

Dated this 14th day of July, 2006.
New York, New York.